

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AXIAL VECTOR ENGINE CORP. fka
AERO MARINE ENGINE, INC.

               Plaintiff,

        v.

TRANSPORTER, INC., a Nevada
Corporation; CRAIG DELLA PENNA;
and DANIEL H. WERNER,

               Defendants.

CV 05-1469-AS

FINDINGS AND RECOMMENDATION

ASHMANSKAS, Magistrate Judge:

    Both the parties and the court are familiar with the
background and the procedural posture of this case. As such,
those details will not be retold here. Pending is Della Penna's
and Werner's Alternative Motions for Summary Judgment seeking an
order granting summary judgment as follows:

1 - FINDINGS AND RECOMMENDATION

           [LB]

> [O]n the claims set forth in Defendants' *Answer, Counter-Claims, Cross-Claims, Third-Party Claims and Derivative Claims* on the grounds that on the basis of the material undisputed facts there is no valid defense to Della Penna and Werner's claims and they are entitled to the damages set forth in their *Answer, Counter-Claims, Cross-Claims, Third-Party Claims and Derivative Claims.*

Motion for Della Penna and Werner at 2 (emphasis in original).[1]

In their memorandum in support, Della Penna and Werner set forth the following "motions": (1) Motion [1]: Aero Marine - A Ponzi Scheme; (2) Motion [2]: Common Law Fraud; (3) Motion 3: Securities Act of 1933; (4) Motion 4: Securities Act of 1934; (5) Motion 5: Violations of Oregon Law; (6) Motion 6: Unlicensed Broker, Dealer and Salesman; (7) Motion 7: ORS 59.115 Omission Liability - Fraud; and (8) Motion 8: Strict Liability.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment: if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[1]    As a threshold matter, Della Penna and Werner's only remaining claims, excluding affirmative defenses, are as follows: First Counterclaim - Common Law Fraud; Second Counterclaim - Violations of the Federal Securities Act/Securities Fraud; Third Counterclaim - Violations of Oregon Securities Law; and Fifth Counterclaim - Breach of the Third-Party Beneficiary Contract. Moreover, the third-party defendants, seven individuals all present or former directors of Axial Vector with the exception of Muna Higgins, were dismissed. By its motion, Della Penna and Werner seek summary judgment against Axial Vector on the common law fraud and securities counts. To the extent Della Penna and Werner seek summary judgment on any other claims, including counter-claims or third-party claims, previously dismissed by this court the motion should be denied.

the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law.  Fed.R.Civ.P. 56(c).  "[T]he
requirement is that there be no genuine issue of material fact."
Anthes v. Transworld Systems, Inc., 765 F.Supp. 162, 165 (Del.
1991)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
247-48 (1986))(emphasis omitted).

    The movant has the initial burden of establishing that no
genuine issue of material fact exists or that a material fact
essential to the nonmovant's claim is absent.  Celotex v.
Catrett, 477 U.S. 317, 322-24 (1986).  Once the movant has met
its burden, the onus is on the nonmovant to establish that there
is a genuine issue of material fact. Id. at 324.  In order to
meet this burden, the nonmovant "may not rest upon the mere
allegations or denials of [its] pleadings," but must instead "set
forth specific facts showing that there is a genuine issue for
trial."  Fed.R.Civ.P. 56(e); see Celotex, 477 U.S. at 324.

    An issue of fact is material if, under the substantive law
of the case, resolution of the factual dispute could affect the
outcome of the case.  Anderson, 477 U.S. at 248.  Factual
disputes are genuine if they "properly can be resolved only by a
finder of fact because they may reasonably be resolved in favor
of either party."  Id. at 250. On the other hand, if after the
court has drawn all reasonable inferences in favor of the

nonmoving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50 (citations omitted).

DISCUSSION

I.   **Motion 1:   Aero Marine - A Ponzi Scheme**
     **Motion 2:   Common Law Fraud**
     **Motion 4:   Securities Act of 1934**
     **Motion 7:   ORS 59.115 Omission Liability Fraud**

By Motions 1 and 2 Della Penna and Werner seek an entry of judgment against Axial Vector on their First Counterclaim for common law fraud on the ground that the transaction was actually an illegal Ponzi Scheme.  According to Della Penna and Werner a Ponzi scheme is "nothing more than a blatant, common law fraud." Specifically, Della Penna and Werner allege that:

> IEP was a front for Samuel Higgins, an individual whose only significant asset was a the controlling interest in the public corporation, Aero Marine, held in names other than his own name.  Aero Marine was completely dependent upon the sale of additional stock to the public to satisfy its own existing obligations.

Motion for Della Penna and Werner at 15.

As the court reads Della Penna and Werner's motion, the allegations of a Ponzi scheme are in support of their claim for common law fraud and not a separate claim.  Indeed, Della Penna and Werner did not specifically allege a Ponzi scheme in their counterclaims.  Accordingly, the court will consider the allegations set forth by Della Penna and Werner to determine

whether the elements of common law fraud have been satisfied as a
matter of law.

In Oregon, the elements of common law fraud are: "(1) a
representation; (2) its falsity; (3) its materiality; (4) the
speaker's knowledge of its falsity or ignorance of its truth; (5)
his intent that it should be acted on by the person and in the
manner reasonably contemplated; (6) the hearer's ignorance of its
falsity; (7) his reliance on its truth; (8) his right to rely
thereon; (9) and his consequent and proximate injury."
Conzelmann v. N. W. P. & D. Prod. Co., 190 Or. 332, 350, 225 P.2d
757 (1950); see also Meader v. Francis Ford Inc., 286 Or. 451,
456, 595 P.2d 480 (1979) (holding that a claim in fraud need not
be founded on a contractual obligation but will lie based on the
knowledge of a falsity of a representation and the intention to
mislead).

By Motions 4 and 7 Della Penna and Werner seek an entry of
judgment against Axial Vector on their Second and Third
Counterclaims for violations of the Federal Securities Act and
Oregon Blue Sky laws, respectively, on the ground Higgins omitted
material facts in the course of negotiating the Purchase
Agreement involving the sale and purchase of stock.

Section 10(b) of the Securities Exchange Act prohibits the
"use or employ, in connection with the purchase or sale of any
security, . . . [of] any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the Commission may prescribe. . . ."  15 U.S.C. § 78j(b); see also In re IKON, 277 F.3d 658, 666 (3d Cir. 2002).  In accordance with this statutory authority, the Securities Exchange Commission promulgated Rule 10b-5, which creates a private cause of action for investors harmed by materially false or misleading statements.  See 17 C.F.R. §240.10b-5.  Rule 10b-5 makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made[,] in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. s 240.10b-5(b).

The elements of a section 10(b) claim are: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss.  See Dura Pharm, Inc. V. Broudo, 544 U.S. 336, 341-342 (2005).[2]

---

[2]    To prove a defendant violated Or. Rev. Stat. §§ 59.115 or 59.135, a plaintiff must show that the defendant sold a security that was not properly registered under Oregon law or sold a security through fraud or deceit.  Both of the Oregon securities statutes in issue create statutory "fraud" actions. Or. Rev. Stat. S 59.115(1)(b) is violated in the event of a negligent misstatement or omission of a material fact.  The other

As set forth above, to prevail on any of the three fraud claims at this stage of the proceedings Della Penna and Werner must prove each element as a matter of law.  Because the three claims have common elements -- knowing, material, false representation or omission, intent -- and because Della Penna and Werner rely on common factual allegations to support each of the fraud counts, the court will consider the three claims together.

Turning to the factual allegations, Della Penna and Werner rely primarily on the following "false misrepresentations" and "omissions" in support their fraud claims:

- IEP was a corporation;

- IEP was authorized to enter into the Purchase Agreement;

- IEP had the "infrastructure to finance" the development and marketing of Transporter, Inc. technology;

- Higgins' controlling interest in IEP;

- Higgins' "financial incapacity;"

- Aero Marine's 25,000,000 shares dilution distribution to IEP.

---

Oregon statute in issue, Or. Rev. Stat. § 59.135, is closely modeled after Rule 10b-5.  See Held v. Product Mfg. Co., 286 Or. 67, 71, 592 P.2d 1005 (1979)("[P]arties agree that ORS 59.135 is similar to federal Rule 10b-5.").  State securities laws parallel the federal laws and are to be interpreted consistently with the federal laws.  See Shivers v. Amerco, 670 F.2d 826, 831 (9th Cir. 1982); Numrich v. Gleason, 1990 WL 209734 *3 (citing Austin V. Baer, Marks & Upham, Fed. Sec. L. Rep. (CCH) para. 92,881, 94,280 (D.Or. July 18, 1986)("In construing the state provision [ORS 59.135], deference is given to developments in the law construing claims under federal Rule 10(b)(5)")).

Motion for Della Penna and Werner at 13-15, 19, 23.  In addition, Della Penna and Werner challenge Higgins' failure to disclose material facts about himself, including but not limited to a prior bankruptcy filing, two felony convictions and a judgment debt.

Axial Vector challenges the request for judgment on the fraud counts on the ground that "Higgins' deposition testimony clearly shows that he did in fact make the relevant disclosures and that his misstatement regarding IEP was made without scienter."  Axial Vector insists that Higgins accurately and directly disclosed the financial status of Aero Marine, including its plans for making the payments required under the Purchase Agreement.  Axial Vector also contends that Higgins disclosed his controlling interest in Aero Marine.  Finally, Axial Vector discounts the remaining grounds set forth by Della Penna and Werner as "salacious details from Mr. Higgins' personal background" that are not material to the challenged transaction.

Turning to the first representation -- IEP's status as a corporation -- Axial Vector directs the court to the following testimony with respect to Higgins' knowledge of IEP's status as a corporation:

Q:   And is IEP a corporation?

A:   No.

Q:   Has it even been a corporation?

8 - FINDINGS AND RECOMMENDATION                              [LB]

A:    No

Q:    Have you ever described it to Mr. Della Penna as a
      corporation?

A:    At the time there was suppose to be a filing, and I
      found out after the fact that a filing was not done.

Q:    A filing with whom?

A:    With the Mexican government.

Q:    And where - in what state in Mexico did you anticipate
      you were going to make some king of filing?

A:    Baja.

Q:    And what kind of filing was it to be?

A:    It would have been a Mexican corporation.

Q:    When did you find out that it was not a Mexican
      corporation?

A:    Month ago.

(Exhibit A, Higgins Dep. 9:16-10:10, December 4, 2006)

      Based on the foregoing, the court finds that there is a

question of fact regarding Higgins' knowledge of IEP's status as

a corporation at the time he entered into the Purchase Agreement

and his intention to mislead Della Penna and Werner regarding

that status.  Moreover, Della Penna and Werner have failed to

establish, as a matter of law, that the representation was

material to the transaction.

      Next, the court will consider the alleged false

representations regarding Aero Marine's financial status.  Axial

Vector has submitted some evidence that, during the negotiation

9 - FINDINGS AND RECOMMENDATION                          [LB]

of the Purchase Agreement, Higgins disclosed both Aero Marine's
financial status and its plans for using new equity financing to
make the contract payments.  Higgins' deposition testimony is as
follows:

> Q:   When you say it's "a start-up company," what do you
>      mean by that?
>
> A:   I define that as pre-revenue
>
> Q:   Has the company ever been with revenue?
>
> A:   Not to my knowledge.
>
> Q:   Did you disclose that to Mr. Della Penna and Mr.
>      Werner?
>
> A:   Yes.
>
> Q:   Why did you discuss the finances of Aero Marine with
>      Mr. Della Penna and Mr. Werner?
>
> A:   I believe that the Transporter software, had it been
>      valid as represented, could reinvigorate Aero Marine
>      and correspondingly, a reinvigorated Aero Marine could
>      provide financing for Mr. Della Penna's and Mr.
>      Werner's software.
>
> Q:   Am I missing something?  You're telling me that Aero
>      Marine has no assets and has no business?
>
> . . . .
>
> Q:   Aero Marine has no business, has no income?
>
> . . . .
>
> Q:   On the date the contract was signed -
>
> . . . .
>
> Q:   -- did Aero Marine have any business?
>
> A:   No.

10 - FINDINGS AND RECOMMENDATION                              [LB]

Q:  So Aero Marine was trying to get the asset of
    Transporter in order to make Aero Marine well.  Is that
    what you're saying?

A:  That's one of the components, yes.

Q:  Okay.  Did you tell Della Penna and Werner that you
    were relying on Transporter to make Aero Marine well?

A:  As one of the components.

Q:  And you told them that?

A:  Yes.

(Exhibit A, Higgins Dep. 140:7-142:2, December 4, 2006)

Additional testimony regarding Aero Marine's financial

status is as follows:

Q:  Well, did you tell Mr. Della Penna that you did not
    have the million dollars that's committed in the
    exclusive purchase agreement?

A:  Yes.

Q:  And did you tell Mr. Werner that you did not have the
    million dollars that's called for in the exclusive
    purchase agreement?

A:  Yes.

Q:  When did you tell them that?

A:  At the vacation property on Mt. Hood at the picnic-
    table meeting.

Q:  So what did you tell them about how you were going to
    pay the million dollars?

A:  That the proposal would be to have Axial - Aero Marine
    do a private placement in order to raise the capital to
    fund the obligation.

11 - FINDINGS AND RECOMMENDATION                              [LB]

Q:   Did you tell Mr. Della Penna that the million-dollar commitment was dependent upon your ability to sell a private placement to raise the money?

A:   Yes.

Q:   And did you tell Mr. Werner that very same thing?

A:   Yes.

Q:   When did you tell him that?

A:   At the picnic table meeting, to the best of my recollection.

. . . .

Q:   . . . I asked if you knew at the time you singed the agreement that you were not able to make the payments of $100,000 due in late September and early October?

A:   All parties were aware of the financial situation.

. . . .

Q:   But when you acquired the technology from Transporter, you knew you had to pay for it, didn't you?

A:   The company and I committed to a payment schedule, yes.

Q:   And at the time you committed to the payment schedule, you had no idea whether or not you could keep the payment schedule you had signed up for in Exhibit 1; isn't that true?

A:   No.

Q:   That's not true?  How were you going to raised the $85,000?

. . . .

THE WITNESS:   As discussed in all the details with Mr. Werner, Mr. Della Penna in negotiating the transaction, they were aware at all times of a best-efforts need to attempt to raise the

financing necessary to complete the
transaction.

(Exhibit A, Higgins Dep. 338:11-339:12; 369:9-14; 380:3-21;

December 4, 2006).

Finally, Higgins' testimony that he told Della Penna and

Werner of his intention to meet the payments due under the

Purchase Agreement through a future stock offering is supported

by  Werner's testimony as follows:

> Q:   The next sentence says:  "You might also want to
>       consider whether you want to sell your company to
>       someone who is essentially trying to buy the company
>       with your own money."
>       What did Mr. Cruz mean when he referred to Mr.
>       Higgins buying your company with your own money?
>
> A:   As I understood it, he said that if somebody wants to
>       buy the company and then use the company to go out and
>       raise capital, tat as opposed to putting their own
>       money into it, we should be careful of that.

(Supplemental Exhibit A, Werner Dep. 116:2-13; November 21,

2006).

As set forth above, Higgins' testimony creates a genuine

issue of fact whether false representations were made to Della

Penna and Werner regarding the financial status of Aero Marine.

Della Penna and Werner have failed to establish as a matter of

law that Higgins intentionally made a material false

representation relied upon by them to their detriment.

With respect to the alleged false omission that Higgins

failed to disclose his controlling interest in Aero Marine, Axial

Vector has submitted some evidence to the contrary in the form of Higgins' deposition testimony. Higgins testified as follows:

Q:   When did you tell him you were representing someone other than IEP?

A:   As part of the conversations, I also told them I was the controlling shareholder of Aero Marine.

. . . .

Q:   Who were you representing?

A:   I explained that I represented IEP and that I was also the controlling shareholder of Aero Marine.

(Exhibit A, Higgins Dep. 111:22-112:1; 112:22-25, December 4, 2006).

Once again it appears that Axial Vector has presented at least some evidence to create a genuine issue of fact. According to Higgins' testimony, Della Penna and Werner were informed by Higgins of his controlling interest in Aero Marine. Viewing the evidence in the light most favorable to Axial Vector, judgment on this question should be denied.

Finally, Della Penna and Werner challenge Higgins' failure to disclose material facts about himself, including but not limited to a prior bankruptcy filing, two felony convictions and a judgment debt. Axial Vector insists that the omissions are not material to the transaction. Specifically, Higgins' personal bankruptcy was filed 33 years ago; the criminal convictions, a 1980 conviction for possession of a controlled substance and a

1982 conviction for theft, are 25 years old; and, the civil
judgment was the result of a routine commercial dispute.

"Whether an omission is 'material' is a determination that
'requires delicate assessments of the inferences a "reasonable
shareholder" would draw from a given set of facts and the
significance of those inferences to him, and these assessments
are peculiarly ones for the trier of fact.'" Fecht v. Price, 70
F.3d 1078, 1080-1081 (9th Cir. 1995)(quoting TSC Indus., Inc. v.
Northway, Inc., 426 U.S. 438, 450 (1976)).  Thus, only if
materiality is "so obvious that reasonable minds [could] not
differ" is summary judgment appropriate.  Id. at 1081 (quotations
and citations omitted).  Based on the evidence in this case, a
jury could reasonably find that Higgins' alleged omissions were
not material and would not have impacted the transaction.  Della
Penna and Werner have failed to establish that the omissions were
material as a matter of law.

As set forth above, genuine issues of material fact are in
dispute regarding questions of knowledge, materiality and intent.
Commonly, the elements necessary to establish fraud claims,
questions of knowledge, intent, materiality and reliance, are
typically fact questions to be determined by a jury and often
require the jury to weigh the credibility of the witnesses.  See,
e.g., In re Software Toolworks, 50 F.3d 615, 626 (9th Cir.
1994)(Summary judgment on the issue of scienter is appropriate

only where "there is no rational basis in the record for
concluding that any of the challenged statements was made with
requisite scienter." (quotations and citations omitted)); <u>Fecht
v. Price</u>, 70 F.3d at 1080.  The circumstances of this case are no
exception.  The parties have submitted conflicting evidence in
support of their account of the negotiations leading to the
Purchase Agreement.  The truth is for a jury to determine.  As
such, Della Penna and Werner's request for judgment as a matter
of law on their First Counterclaim, Second and Third
Counterclaims for common law fraud, and violations of the Federal
Securities Act and Oregon Blue Sky laws, respectively, under
"Motion 1:  Aero Marine - A Ponzi Scheme; Motion 2:  Common Law
Fraud; Motion 4:  Securities Act of 1934; Motion 7:  ORS 59.115
Omission Liability Fraud" should be denied.

**II.  Motion 3:    Securities Act of 1933**
**       Motion 5:    Violations of Oregon Law**
**       Motion 6:    Unlicensed Broker, Dealer and Salesman**
**       Motion 8:    Strict Liability**

By Motions 3 and 5, Della Penna and Werner seek summary
judgment against Axial Vector on its Second and Third
Counterclaims for violations of the Federal Securities Act and
Oregon Blue Sky laws, respectively, on the ground that the shares
of Aero Marine common stock issued to Della Penna and Werner were
not registered as required by federal and state securities law.
Further, by Motion 6, Della Penna and Werner maintain that the
sale was unlawful because it was not made by a person authorized

16 - FINDINGS AND RECOMMENDATION                              [LB]

to make such a sale.  Finally, under a heading titled "Motion 8:
Strict Liability," Della Penna and Werner state that "[b]oth the
Federal and Oregon Securities Laws impose strict liability upon
licensed sellers of unregistered securities and those who assist
them."  Motion for Della Penna and Werner at 24.

Section 12 of the Securities Act provides, in pertinent
part, that:

> Any person who-(1) offers or sells a security in violation
> of section [5] . . . shall be liable to the person
> purchasing such security from him, who may sue either at law
> or in equity in any court of competent jurisdiction, to
> recover the consideration paid for such security with
> interest thereon, less the amount of any income received
> thereon, upon the tender of such security, or for damages if
> he no longer owns the security.

15 U.S.C. § 77l.

Section 5, referred to in section 12 above provides, in
part, that if a security is unregistered, it is unlawful for a
person to sell or deliver the security in interstate commerce.
See 15 U.S.C. § 77e.  There are a number of exemptions, however,
that enable an issuer to avoid the registration requirement of
the Securities Act.  Relevant here is  section 4(2), often
referred to as the "private-offering" exemption, and it excuses
from registration "transactions by an issuer not involving any
public offering."  See 15 U.S.C. § 77d(2); see also SEC v.
Ralston Purina Co., 346 U.S. 119 (1953) (establishing criteria
for determining whether an offering fits the private-offering
exemption).

To determine whether an issuer's offerings qualify for this exemption, the Supreme Court has held that courts must examine whether allowing the exemption is consistent with the promotion of the "full disclosure of information thought necessary to informed investment decisions" and whether "the class of persons affected needs the protection of the [Securities] Act." <u>Ralston Purina</u>, 346 U.S. at 124-25.  Courts have identified various factors that should be considered in determining whether an offering is exempt under section 4(2):  (1) the number of offerees; (2) the relationship of the offerees to each other and the issuer; (3) the manner of the offering, information disclosure or access; and (4) the sophistication of the offerees. <u>SEC v. Life Partners</u>, 912 F.Supp. 4, 10 (D.D.C. 1996) (citing <u>Western Fed. Corp. v. Erickson</u>, 739 F.2d 1439, 1442 (9th Cir. 1984)).[3]

---

[3]       Similarly, under Oregon law:

It is unlawful for any person to offer or sell any security in this state, unless:

(1) The security is registered and the offer or sale is not in violation of any rule or order of the commissioner or any condition, limitation or restriction imposed by him upon such registration; or

(2) The security is exempt under ORS 59.025 or the sale is exempt under ORS 59.035.

Or. Rev. Stat. § 59.055.

Section 59.035(12)(a) provides:

18 - FINDINGS AND RECOMMENDATION                              [LB]

Here, the number of offerees was limited. Indeed, it is undisputed that there were two offerees -- Della Penna and Werner. Generally, a small number of offerees indicates that the offering was private, while a large number indicates that it was

_____

> The following transactions are exempt from ORS 59.049 and 59.055 if they are not part of an attempt to evade fraudulently any provision of the Oregon Securities Law:
>
> (12)(a) Any transactions in securities by an offeror within or without this state that meet all of the requirements of subparagraph (A) or (B) of this paragraph and all of the requirements of subparagraphs (C), (D) and (E) of this paragraph:
>
> (A) When the offeror is an issuer, the transactions result in not more than 10 purchasers within this state of securities of the issuer during any 12 consecutive months.
>
> (B) When the offeror is a nonissuer the securities must have been bought and held for at least 12 consecutive months and the transactions result in not more than 10 purchasers within this state of securities from the nonissuer during any 12 consecutive months.
>
> (C) No commission or other remuneration is paid or given directly or indirectly in connection with the offer or sale of the securities.
>
> (D) No public advertising or general solicitation is used in connection with any transaction under this exemption.
>
> (E) At the time of any transaction under this exemption the offeror does not have under the Oregon Securities Law an application for registration or an effective registration of securities which are part of the same offering.
>
> Or. Rev. Stat. § 59.035(12)(a).

public.  Regardless, the number of offerees is not determinative:
"No particular numbers are prescribed.  Anything from two to
infinity may serve: perhaps even one . . . ."  <u>Ralston Purina</u>,
346 U.S. at 125 n.11.

In addition, the manner of the offering was not a general
solicitation.  Axial Vector has represented that there was no
advertising, no general solicitation of the public and no brokers
or dealers were used to promote or sell the securities.  <u>See</u>,
<u>e.g.</u>, <u>Hill York Corp. v. American Intern. Franchises, Inc.</u>, 448
F.2d 680, 689 (5th Cir. 1971) ("[P]ublic advertising is
incompatible with the claim of private offering.").  Aero Marine
issued but two stock certificates, one each for Della Penna and
Werner, and they were issued in accordance with a commercial
contract negotiated by the majority stockholder.

Next, Axial Vector alleges that Della Penna and Werner were
"both relatively sophisticated."  While evidence of the offerees'
investment sophistication is useful, lack of proof of investment
sophistication will not preclude a finding that the offer was
private.  <u>See Doran v. Petroleum Management Corp.</u>, 545 F.2d 893,
902 n.10 (5th Cir. 1977).  In addition, proof of investment
sophistication is of little value unless accompanied by evidence
that the offerees either received or had access to the
information that would have been included in a registration
statement.  <u>Id</u>. at 902.  Axial Vector supports its allegation

that Della Penna and Werner were sophisticated offerees with evidence that Werner was an experienced businessman with a background in international trade finance; that Della Penna had worked for both Intel and Microsoft, he occupied management positions at smaller technology firms; both men held at least one university degree and both pursued some graduate studies; and Della Penna and Werner received the advice of counsel prior to the transaction.

Further, Axial Vector alleges that ample opportunity was provided to obtain materials and information relating Higgins and Aero Marine. Aero Marine was a reporting company under the Exchange Act and files detailed quarterly and annual reports were available free of charge to the public. In fact, the record indicates that these materials were reviewed by the attorneys at Davis, Wright and Termaine, Della Penna and Werner's former counsel. The record also reveals that former counsel supplied Della Penna and Werner with a list of due diligence requests for Higgins but that Della Penna and Werner failed to present the requests to him.

Lastly, the court considers the final factor, whether "the offerees have relationships with the issuer affording them access to or disclosure of the sort of information about the issuer that registration reveals." SEC v. Murphy, 626 F.2d 633, 647 (9th Cir. 1980). Della Penna and Werner did not have a pre-existing

relationship with Aero Marine.  Nevertheless, they engaged in direct contractual negotiations with Higgins for several weeks prior to entering the Purchase Agreement.

The court finds there are disputed issues of material facts regarding whether the transfer of shares of Aero Marine common stock to Della Penna and Werner under the Purchase Agreement was exempt from the registration requirements of 15 U.S.C. § 77e and Or. Rev. Stat. § 59.055.  Accordingly, Della Penna and Werner's request for summary judgment on its Second and Third Counterclaims under "Motion 3:  Securities Act of 1933" and "Motion 5:  Violations of Oregon Law" should be denied.  See, e.g. Hill York, 448 F.2d at 687 (Whether an offering is public or private is a question of fact which must be resolved in light of the particular circumstances of each case.).[4]

---

[4]      The "private offering" exemption is an affirmative defense that must be raised and proved by the defendant.  See Swenson v. Engelstad, 626 F.2d 421, 425 (5th Cir. 1980). Similarly, in Oregon, the party relying on exemption from the registration provisions of Oregon state securities laws must plead such exemptions as an affirmative defense.  If, such as the case at hand, the issue is raised by way of defendant's counterclaim, the burden of pleading the exemption is on the plaintiff.  See Marshall v. Harris, 276 Or. 447, 458, 555 P.2d 756 (1976); see also Or. Rev. Stat. § 59.275.  Here, Axial Vector has effectively raised the defense in opposition to Della Penna and Werner's motion for summary judgment on its counterclaims on the issue of registration.  Because the court can perceive no prejudice to Della Penna and Werner under the circumstances of this case, Axial Vector is granted leave to amend their "Reply to Counterclaims" to include the "private offering" exemption as an affirmative defense.

By Motion 6, Della Penna and Werner request summary judgment against Axial Vector on their claim for a violation of Oregon Blue Sky laws on the ground that neither Aero Marine or Higgins were licensed as required by state law and, therefore, are liable under Or. Rev. Stat. § 59.165 for the sale of common stock to Della Penna and Werner. Section 59.165 provides, in relevant part, as follows:

(1) It is unlawful for any person to transact business in this state as a broker-dealer or salesperson unless the person is licensed under the Oregon Securities Law.

(2) A broker-dealer or state investment adviser may not be licensed in this state unless the broker-dealer or state investment adviser has at least one salesperson licensed in this state.

(3) It is unlawful for a broker-dealer or issuer or owner of securities to employ a salesperson to act in this state unless the salesperson is licensed under the Oregon Securities Law to the broker-dealer or issuer or owner of securities. Only a natural person may be licensed as a salesperson.

Or.Rev.Stat. § 59.165

Although not entirely clear from the pleadings, it appears that Della Penna and Werner contend that Higgins acted as a "salesperson" in transferring the shares of Aero Marine common stock to them in accordance with the Purchase Agreement. It is undisputed, however, that Higgins was the controlling shareholder in Aero Marine and, therefore, "an issuer effecting sales of its

own securities."  See Or. Rev. Stat. 59.015(1)(a).[5]  As such, the

transfer of shares of Aero Marine common stock by Higgins was

exempt from the requirements of section 59.165.  Accordingly,

Della Penna and Werner's request for summary judgment on its

Third Counterclaim under "Motion 6:  Unlicensed Broker, Dealer

and Salesman" should be denied.

Finally, Della Penna and Werner seek summary judgment

against Axial Vector and Higgins on the ground that both the

Federal and Oregon Blue Sky laws "impose strict liability upon

unlicensed sellers of unregistered securities and those who

assist them."  Because Della Penna and Werner have failed to

establish violations of either the Securities Act or Oregon Blue

Sky laws their request for judgment under "Motion 8:  Strict

Liability" should be denied.

---

[5]     Section 59.015(1)(a) provides, in part:

As used in the Oregon Securities Law, unless the context
otherwise requires:

(1) "Broker-dealer" means a person who engages, all or part
of the time, in effecting transactions in securities for the
account of others or for the person's own account. "Broker-
dealer" does not include:

(a) An issuer effecting sales in its own securities[.]

Or. Rev. Stat. § 59.15(1)(a).

24 - FINDINGS AND RECOMMENDATION                    [LB]

**CONCLUSION**

Based on the foregoing, Della Penna and Werner's Alternative Motions for Summary Judgment - Liability (doc. #204) should be DENIED.

DATED this 1st day of June 2007

DONALD C. ASHMANSKAS
United States Magistrate Judge

**SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review.  Objections, if any, are due June 18, 2007.  If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.  If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

25 - FINDINGS AND RECOMMENDATION                                    [LB]