UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

AXIAL VECTOR ENGINE CORP. fka
AERO MARINE ENGINE, INC.

       Plaintiff,

       v.

CRAIG DELLA PENNA,
and DANIEL H. WERNER,

       Defendants.

Civil No. 05-1469-HA

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

HAGGERTY, District Judge:

       This court, upon review of the pleadings, submissions by all parties, sworn testimony of witnesses, and other evidence introduced by the parties, makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure:

1.      At all times relevant hereto, plaintiff Axial Vector Engine Corp., formally known as Aero Marine Engine, Inc., (Aero Marine or plaintiff) was a Nevada corporation with its principal place of business in Oregon.

2.      Defendants Craig Della Penna and Daniel H. Werner (defendants or Della Penna and

1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Werner) are individuals residing in Oregon.

3.  At all times relevant hereto, Della Penna and Werner were the sole shareholders, officers, and directors of Transporter, Inc. (Transporter), a Nevada corporation with its principal place of business in Oregon.

JURISDICTION

1.  This court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §§ 1331 and 1367, 15 U.S.C. §78aa *et seq.*, and pendent jurisdiction over the common law and Oregon statutory claims.

FINDINGS OF FACT

1.  In 2004, Transporter was a start-up company seeking investment financing to fully develop and bring to market its only major asset, a suite of software (Transporter Software) designed to provide secure, multi-platform, multi-party voice and video-conferencing communications over the internet.

2.  As of August 24, 2004, the Transporter Software was still in development. It was capable of supporting four participants using a Microsoft operating system over a local area network. The Transporter Software was not yet multi-platform, secure, or capable of operating over a wide area network (WAN).

3.  In their search for financing, defendants met plaintiff's controlling shareholder, Samuel Higgins (Higgins), through a common acquaintance.

4.  Defendants and Higgins discussed and negotiated the possible financing and development of the Transporter Software in a series of e-mail exchanges, telephonic conversations, and face-to-face meetings.

5.  In the course of the negotiations, Higgins represented himself to be a successful

international businessman with access to large amounts of capital and the managing director of International Equity Partners, S.A. (IEP), a lawful Mexican corporation.

5. In his negotiations with defendants, Higgins did not reveal that IEP was not a lawfully registered corporation, that IEP was merely a shell, or that he had a troubled personal and professional history including a past involving securities fraud. At this time, Higgins was aware that IEP was not a lawfully registered corporation and he purposefully concealed the above information.

6. In their negotiations with Higgins, defendants, and Della Penna in particular, represented that the Transporter Software was capable of supporting five participants using a Microsoft operating system over a WAN, that the Transporter Software was secure, that the Transporter Software would soon be able to support other operating systems, and that the Transporter Software would soon have multi-platform functionality. Each of these representations was false and was known to be false by defendants at the time the representations were made.

7. Higgins did not however, rely on these misrepresentations because he had no intent of financing the development of the Transporter Software.

8. Through mid-August 2004, Higgins and defendants negotiated the possible financing or sale of Transporter to Magellan Film Entertainment or Magellan Group (Magellan).

9. Defendants discussed their negotiations regarding Magellan with their attorneys at Davis Wright Tremaine, LLP (DWT).

10. Attorneys at DWT advised defendants that they had serious concerns about any transaction with Magellan, because Magellan was merely a shell corporation and any deal would likely be fraudulent.

11. At all times relevant hereto, Richard Fowlks was serving as the attorney for Higgins.

3 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

12.    On the morning of August 23, 2004, Higgins notified defendants that he had an offer for them that would need to be acted on quickly.

13.    After receiving this news, Werner spoke on the phone with an attorney from DWT who advised him not to enter into an agreement with Magellan.

14.    On the afternoon of August 23, 2004, defendants met with Higgins at Fowlks' office.

15.    Higgins notified defendants that IEP was willing to purchase Transporter and the Transporter Software through Aero Marine. Prior to this time, defendants had never heard of Aero Marine.

16.    Higgins represented that Aero Marine had recently entered into a lucrative deal selling its proprietary and revolutionary engine to the military, and that both Aero Marine and IEP were capable of financing a deal with Transporter. Higgins also represented that IEP and Aero Marine were willing to finance the development of the Transporter Software. These representations were false, and were known to be false by Higgins at the time they were made.

17.    Defendants did not, reasonably rely on these misrepresentations because they had been informed by their consel at DWT that Higgins was operating a fraud.

17.    On the afternoon of the August 23, 2004, the parties drafted a purchase agreement, titled "Exclusive Purchase." A copy of the Exclusive Purchase was faxed to defendants' attorneys.

18.     On the morning of August 24, 2004, defendants returned to Fowlks' office. At Higgins' request, Fowlks advised them that the deal was "take it or leave it" and must be signed immediately. Fowlks had made several changes to the Exclusive Purchase both at the request of defendants and on his own initiative. The Exclusive Purchase was renamed "Exclusive Purchase Agreement." At this time defendants had been unable to discuss the particulars of the Exclusive Purchase Agreement with their attorneys and their attorneys had not yet reviewed the Exclusive

4 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Purchase. However, their attorneys had instructed them not to sign any agreement.

19. On August 24, 2004, Transporter and IEP entered into the Exclusive Purchase Agreement, which provided in relevant part that:

    a. IEP would purchase all of Transporter's issued and outstanding stock for $3,000,000.00, of which $100,000.00 would be paid in sixty days and $900,000.00 in intervals over twenty-four months pursuant to agreement of Transporter and Aero Marine;

    b. Defendants would receive 1,000,000 shares of restricted stock in Aero Marine, which was guaranteed to be worth at least $2.00 per share at the time the restriction was removed.

    c. IEP was willing to finance, directly or indirectly, the construction and trials of the Transporter Software;

    d. Defendants would "receive a royalty on the intellectual property equal to 5% of all gross sales exclusive of NATO military purchasers";

    e. IEP assigned its rights under the Exclusive Purchase Agreement to Aero Marine;

    f. Transporter's acceptance was subject to review by defendants' attorney.

20. On the afternoon of August 24, 2004, after defendants had signed the Exclusive Purchase Agreement, their attorneys at DWT informed them, in no uncertain terms, that the deal was bad and was likely fraudulent, and that they should not have entered into the Exclusive Purchase Agreement.

21. Defendants indicated that they were willing to accept the risk that plaintiff was not a bonafide investor because they were in need of financing and had no other viable options.

22. Pursuant to the terms of the Exclusive Purchase Agreement, plaintiff issued 1,000,000

5  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

shares of its stock to defendants.

23. No stock in Transporter was ever issued or delivered to plaintiff, either by Della Penna, Werner, or Transporter.

24. Plaintiff made payments to defendants roughly totaling $33,000.

25. Over the next several months, the parties to the Exclusive Purchase Agreement engaged in unsuccessful negotiations with third parties to finance the development of the Transporter Software.

26. Over this time period, there were two unsuccessful and abortive attempts to demonstrate the capabilities of the Transporter Software. Responsibility for these failures is shared by all those involved. The Transporter Software was incapable of a successful demonstration over a WAN, and plaintiff and its agents were unsupportive of the demonstrations.

27. During this time period, defendants became increasingly insistent that additional money was needed to further develop the Transporter Software. However, such funds were not forthcoming. Plaintiff failed to both pay the full price for the Transporter Software under the Exclusive Purchase Agreement and to fund its development.

28. On May 26, 2005, plaintiff filed a complaint against Transporter and defendants in the United States District Court for the District of Nevada (CV-S-05-0064-RCJ-LRL).

29. After Plaintiff filed its complaint in the District of Nevada, defendants filed an involuntary bankruptcy petition against Transporter in the United States Bankruptcy Court for the District of Oregon, Case No. 05-36661-elp7.

30. The Bankruptcy Court entered its order for relief in the Transporter case on September 8, 2005. Following entry of the Bankruptcy Court's Order for Relief, the Chapter 7 bankruptcy trustee entered into an Agreement for Compromise and Settlement of Dispute and

6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Assignment of Claims and Causes of Action (Settlement Agreement) dated January 17, 2006.

31. Defendants objected to the proposed settlement. However, on May 22, 2006, the Bankruptcy Court issued an Order Approving Settlement, whereby the court approved the Settlement Agreement, and expressly declared that the Exclusive Purchase Agreement was rescinded.

32. On April 14, 2009, this court ordered defendants to return plaintiff's stock as the Exclusive Purchase Agreement had been rescinded.

33. In reaching these findings of fact, the court considered the pleadings, submissions by all parties, sworn testimony of witnesses, and other evidence introduced by the parties. This task was made especially difficult because many witnesses were not credible. In reaching its findings of fact, the court found that:

   a. Higgins' version of events strains credulity and his testimony lacks credibility;

   b. The testimony of Dr. Raymond Brouzes with respect to the failed demonstrations of the Transporter Software was largely implausible;

   c. Fowlks' description of the events surrounding the drafting and negotiation of the Exclusive Purchase Agreement was unconvincing;

   d. The testimony of William Silhan was credible;

   e. The testimony of plaintiff's expert witness, Gary Liao, regarding the capabilities of the Transporter Software was reliable and convincing;

   f. Della Penna was found to be of suspect credibility and his claims that he did not oversell the Transporter Software are far-fetched;

   g. Werner's testimony was largely credible, however, his memory regarding the sequence of events on August 23-24, 2004, was faulty;

      h.      The telephonic testimony of Donna Lightbourne was generally credited, but given little weight due to the fact that she did not have supporting documentation with her and the facts to which she testified were of relatively little importance.

      i.      The testimony of Gustavo J. Cruz, Jr. was generally accurate and credible.

CLAIMS

1.    At the time of trial, plaintiff's remaining claims were for: (1) securities fraud under federal law, (2) securities fraud under Oregon law, and (3) common law fraud.

2.    At the time of trial, defendants' remaining claims were for: (1) securities fraud under federal law, (2) securities fraud under Oregon law, and (3) common law fraud.

CONCLUSIONS OF LAW

1.    Defendants violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 by deliberately and knowingly making material misrepresentations concerning the capabilities and development of the Transporter Software. Defendants made these misrepresentations to induce IEP to enter into the Exclusive Purchase Agreement and to induce plaintiff to issue shares of its stock and provide cash to defendants.

2.    Defendants violated Or. Rev. Stat. (ORS) 59.135 by deliberately and knowingly making material misrepresentations concerning the capabilities and development of the Transporter Software. Defendants made these misrepresentations to induce IEP to enter into the Exclusive Purchase Agreement and to induce plaintiff to issue shares of its stock and provide cash to defendants.

3.    Under the common law theory of fraud, defendants knowingly made material misrepresentations of fact concerning the capabilities and development of the Transporter Software. Defendants made these misrepresentations to induce IEP to enter into the Exclusive

8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Purchase Agreement and to induce plaintiff to issue shares of its stock and provide cash to defendants.

4.      Plaintiff did not rely on any of defendants' misrepresentations because plaintiff had no intent of developing or marketing the Transporter Software, and was in fact operating a fraudulent scheme.

5.      Plaintiff suffered no compensable injury as a direct or proximate result of defendants' misrepresentations.  Plaintiff's payments of roughly $33,000 to defendants were made for the purposes of furthering its own fraudulent scheme and do not constitute compensable injury.

6.      Defendants are not liable to plaintiff on any of plaintiff's claims.

7.      Plaintiff violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 by deliberately and knowingly making material misrepresentations concerning plaintiff's ability and willingness to finance the development of the Transporter Software.  Plaintiff made these misrepresentations to induce defendants to enter into the Exclusive Purchase Agreement and to induce defendants to transfer Transporter's assets and stock to plaintiff.

8.      Plaintiff violated ORS 59.135 by deliberately and knowingly making material misrepresentations concerning plaintiff's ability and willingness to finance the development of the Transporter Software.  Plaintiff made these misrepresentations to induce defendants to enter into the Exclusive Purchase Agreement and to induce defendants to transfer Transporter's assets and stock to plaintiff.

9.      Under the common law theory of fraud, plaintiff knowingly made material misrepresentations of fact concerning plaintiff's ability and willingness to finance the development of the Transporter Software.  Plaintiff made these misrepresentations to induce defendants to enter into the Exclusive Purchase Agreement and to induce defendants to transfer

9  - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Transporter's assets and stock to plaintiff.

10.     Defendants did not reasonably rely on any of plaintiff's misrepresentations because defendants were aware that plaintiff was likely operating a fraud and defendants were willing to accept the risks inherent in that fraud.

11.     Defendants suffered no compensable injury as a direct or proximate result of plaintiff's misrepresentations.

12.     Plaintiff is not liable to defendants on any of defendants' claims.

13.     Plaintiff's Motion for Judgment as a Matter of Law is rendered moot by these conclusions of law.

IT IS SO ORDERED.

Dated this  6   day of May, 2009.

                                               /s/ Ancer L. Haggerty     
                                               Ancer L. Haggerty
                                          United States District Judge